**AFFIRMED and Opinion Filed October 28, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-24-00822-CV**

**IN THE INTEREST OF T.K., L.T.K., L.J., AND L.A.K., CHILDREN**

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-21-01161-W**

## MEMORANDUM OPINION

Before Justices Reichek, Goldstein, and Garcia
Opinion by Justice Garcia

This appeal arises from a proceeding to terminate parental rights as to four children. Appellant Father was adjudicated to be the father of only one of the four children, L.J. After a bench trial, the judge signed a decree terminating all parents' rights as to all four children. Father appeals. We affirm.

### I. BACKGROUND

On December 10, 2021, the Texas Department of Family and Protective Services filed an original petition seeking, among other things, to terminate parental rights as to four children: T.K. (male; five years old), L.T.K. (female; three years old), L.J. (female; almost two years old), and L.A.K. (female; a few months old).

The Department alleged that Mother was the mother of all four children and that Father was the father of L.T.K. and L.J. The Department further alleged that it had already taken possession of the children based on evidence that T.K. and L.T.K. had been physically abused. On the same day, a judge signed an ex parte order for emergency care and temporary custody of the children.

Genetic testing established that Father was L.J.'s father but was not L.T.K.'s father. According to the final decree, the fathers of L.T.K. and L.A.K. were unknown.

On December 8, 2022, the trial judge signed an order directing the immediate monitored return of L.J. and L.A.K. to Mother. T.K. and L.T.K. were also to be returned to Mother on a monitored basis by January 6, 2023. The same order extended the case's dismissal date to June 9, 2023.

The deadline to return T.K. and L.T.K. to Mother was later extended to March 17, 2023.

A report by Dallas Court Appointed Special Advocates indicates that on March 5, 2023, Mother contacted the Department and said that she wanted L.J. and L.A.K. removed from her care. On March 8, 2023, the trial judge signed an ex parte order removing the children.

On April 7, 2023, the trial judge signed an order extending the case's dismissal date to September 1, 2023. The same order set the case for trial "on **August , 2023** [sic]."

On August 15, 2023, the trial judge began the bench trial of this case. She swore in the witnesses, took appearances, and heard testimony from caseworker Meredith Reeder to the effect that some DNA testing was pending and that the Department was asking for a recess to allow the completion of that testing. The Department's attorney also advised the judge that a mediation was pending and that the Department believed it was premature to try to conclude the trial at that time. The judge recessed the trial until October 24, 2023.

The trial resumed and concluded on June 11, 2024. That same day, a partial mediated settlement agreement (MSA) was filed in the case. In that MSA, Mother agreed to the termination of her rights as to all four children, and T.K.'s father agreed to the termination of his rights as to T.K. Thus, the trial focused on Father's parental relationship with L.J. After the close of evidence, the judge orally ruled that Father's parent–child relationship with L.J. would be terminated.

On June 21, 2024, the trial judge signed the decree terminating all four children's parent–child relationships with their parents. The decree included findings that Father committed the conduct defined in Family Code § 161.001(b)(1)(D) and (E), as well as a finding that terminating Father's parent–child relationship with L.J. was in L.J.'s best interest. Father timely appealed.

## II.   JURISDICTION

Shortly after Father perfected this appeal, we sent the parties a letter questioning whether the trial court lost jurisdiction in this case before it rendered

judgment. *See* TEX. FAM. CODE ANN. §§ 263.401, 263.403. We noted that the computer-generated case summary reflected that there was a bench trial on August 15, 2023, but nothing else in the record supported that fact. Accordingly, we solicited jurisdictional letter briefs from the parties.

A few weeks later, we received and filed a supplemental reporter's record of the proceedings held on August 15, 2023. As discussed above, that record reflects that on that date the trial judge swore in the witnesses, took appearances, and heard testimony from one witness, caseworker Meredith Reeder. This was sufficient to constitute commencement of the trial on the merits for Family Code purposes. *See In re H.B.C.*, No. 05-19-00907-CV, 2020 WL 400162, at *12 (Tex. App.—Dallas Jan. 23, 2020, no pet.) (mem. op.).

Because the trial on the merits commenced before the extended automatic dismissal date of September 1, 2023, we conclude that the trial court did not lose jurisdiction over this case under § 263.401 and § 263.403.

### III. ISSUES PRESENTED

Father presents two issues on appeal. In his first issue, he challenges the legal and factual sufficiency of the evidence to support the trial judge's finding that termination was in L.J.'s best interest. In his second issue, he challenges the trial judge's appointment of the Department as L.J.'s permanent managing conservator.

## IV. STANDARD OF REVIEW

Because terminating parental rights implicates fundamental interests, the clear and convincing standard of proof applies at trial in termination cases. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "Clear and convincing evidence" is the measure or degree of proof that will produce in the factfinder's mind a firm belief or conviction as to the truth of the allegations to be established. FAM. § 101.007.

Our standards of review reflect the elevated burden of proof at trial. *In re A.C.*, 559 S.W.3d 176, 180 (Tex. App.—Dallas 2017), *aff'd*, 560 S.W.3d 624 (Tex. 2018). Under both legal- and factual-sufficiency standards, we consider all the evidence, defer to the factfinder's determinations as to witness credibility, and determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.*; *see also In re A.B.*, 437 S.W.3d at 503 (describing the factfinder as "the sole arbiter when assessing the credibility and demeanor of witnesses"). The distinction between the two standards lies in the extent to which we may consider disputed evidence contrary to a finding. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In a legal-sufficiency review, we credit evidence that supports the finding if a reasonable factfinder could have done so, and we disregard contrary evidence unless a reasonable factfinder could not have done so. *See In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). However, we do not disregard undisputed facts that do not support the finding. *Id.* at 113. Even evidence that does more than raise surmise and

suspicion will not suffice as clear and convincing unless it can produce a firm belief or conviction that the allegation is true. *Id*. If no reasonable factfinder could form a firm belief or conviction that the allegation is true, the evidence is legally insufficient. *Id*.

In a factual-sufficiency review, by contrast, we must weigh disputed evidence contrary to the finding against all the evidence that supports the finding. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. (footnote omitted).

## V.   ANALYSIS

### A.   Issue One: Whether the evidence is sufficient to support the finding that terminating the parent–child relationship was in L.J.'s best interest.

#### 1.   Applicable Law

A court may terminate a parent–child relationship upon findings by clear and convincing evidence that: (i) the parent engaged in one or more of the courses of conduct defined by Family Code § 161.001(b)(1), and (ii) termination is in the child's best interest pursuant to § 161.001(b)(2). *See* FAM. § 161.001(b).

The best-interest element is child-centered and focuses on the child's wellbeing, safety, and development. *In re T.J.*, No. 05-22-00954-CV, 2023 WL 1988838, at *9 (Tex. App.—Dallas Feb. 14, 2023, no pet.) (mem. op.). The

factfinder may consider the following factors as relevant to the best-interest determination:

(1)     the desires of the child;

(2)     the emotional and physical needs of the child now and in the future;

(3)     the emotional and physical danger to the child now and in the future;

(4)     the parental abilities of the individuals seeking custody;

(5)     the programs available to assist these individuals to promote the best interest of the child;

(6)     the plans for the child by these individuals or by the agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one; and

(9)     any excuse for the acts or omissions of the parent.

*Id*. at *9–10; *see also Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Family Code § 263.307(b) lists additional best-interest factors that include (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) whether the child's family is willing and able to seek, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; and (4) whether the child's family demonstrates adequate parenting skills. FAM. § 263.307(b)(1), (7), (10), (12).

These factors are not exhaustive. *See In re T.J.*, 2023 WL 1988838, at \*10. There need not be evidence of every factor, particularly if the evidence was undisputed that the parental relationship endangered the child's safety. *Id*. Although there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest. *Id*.

### 2. Summary of the Evidence

The evidence introduced at trial supported the following facts.

Father was born in 1990. He has a learning disability and ADHD, and he cannot read or spell. He testified that he has not been on medication since 2012 and that he has never used illegal substances.

Before getting involved with Mother, Father fathered a son, not involved in this case, in or about 2010. That same year, he was arrested for an assaultive offense against that child's mother, and he pleaded guilty to a class A misdemeanor. Evidence indicated that he completed community supervision arising from that case in 2014. Father's son lives with his mother.

In or about 2014, Father fathered a daughter; again, neither this child nor her mother is involved in this case. This child lives with her mother.

Also in 2014, Father began a relationship with Mother. In February 2016, Mother gave birth to a son, T.K., but Father was not T.K.'s father. In February 2018, Mother gave birth to a daughter, L.T.K., and she told Father that he was L.T.K.'s

father. DNA testing during this litigation, however, proved that Father is not L.T.K.'s father.

Mother and Father's relationship involved domestic violence. In 2018, Mother was arrested for aggravated assault with a deadly weapon against Father. Father was charged with committing an assault against Mother on or about June 13, 2018. This case resulted in a protective order that required Father to post a $30,000 bond and ordered him not to communicate with Mother and not to go near any place frequented by her. He was then charged with violating this protective order and assaulting Mother again on or about December 2, 2018. He acknowledged that this fight took place in front of the children and that he was arrested. The charge resulted in another protective order, signed April 25, 2019, that barred him from communicating with Mother or being near any place she frequented. In July 2019, he pleaded guilty to the charge and was placed on deferred-adjudication community supervision for the December 2018 offense.

In December 2019, Mother gave birth to L.J. DNA testing during this litigation confirmed with 99.999999% certainty that Father is L.J.'s father.

In early 2020, the Department of Family and Protective Services received a referral about Mother and Father's family, and Kierstan Washington was the assigned investigator. Washington testified that she tried to schedule a meeting with Mother, and Mother "became evasive." It took "some months" to locate Mother, but Washington did eventually meet with her towards the end of 2020. Mother initially

agreed to participate in family-based safety services, but she did not complete them. Father was also involved in conversations about services, but he did not agree to participate.

Then the Department received another referral about the family involving allegations that Mother had stabbed Father at her apartment complex. Washington testified that she went to the scene and saw a screwdriver and blood on a window sill and door. She was unable to locate the children at that time, but she did locate Father in a hospital. Father told her that Mother stabbed him with a screwdriver at her home.[1] He also said that he knew that having contact with Mother violated an order then in place. At some point, Father told Washington that the children were present when the stabbing incident occurred. As a result of this incident, the three children were removed; T.K. was placed with his father, and the two girls were placed in foster care.

The children were returned at some point. And Mother gave birth to a fourth child, L.A.K., in August 2021.

Then all four children were removed in December 2021 at the commencement of this case. The children were removed because of physical abuse. Specifically, T.K.'s father knocked some of his teeth out, and Mother whipped L.T.K. with a belt. L.T.K.'s injuries were noticed at daycare after Father dropped her off there.

---

[1] Father contradicted Washington's testimony and denied that Mother caused his injury, but the trial judge was entitled to credit Washington's testimony over his.

In December 2022, the trial judge ordered the monitored return of the children to Mother. The two youngest children (L.J. and L.A.K.) were to be returned to Mother immediately, and the two oldest children were to be returned to Mother by January 6, 2023. By agreement of the parties, the return of the two oldest children was later deferred to March 17, 2023. But on March 8, 2023, the judge terminated the monitored return. Court-appointed special advocate (CASA) Page McAnear testified that L.J. and L.A.K. were then taken back to their previous foster home and were very excited to see "mom and dad."

Initially, Father did not participate in this case. Case manager Caitlin Edgeworth testified that Father finally came forward towards the end of the summer of 2023 "in an effort to begin to work services."

As will be discussed in more detail below, Department witnesses testified that the children were happy in their placement, that the Department's plan is for the children to be adopted by their foster parents, and that L.J. was not very bonded with Father.

### 3. Application of the Law to the Facts

#### a. L.J.'s Age, Vulnerability, Needs, and Desires

L.J. was born in December 2019, was removed from Mother and Father for purposes of this case in December 2021, and was about four-and-a-half years old when the trial concluded in June 2024. Although she was too young to specifically express any relevant desires, the trial judge was entitled to consider whether L.J. had

bonded with her foster family and, conversely, whether she had spent minimal time with Father. *See In re C.S.*, No. 05-24-00310-CV, 2024 WL 3933885, at *9 (Tex. App.—Dallas Aug. 26, 2023, no pet. h.) (mem. op.).

The evidence showed that L.J. had bonded with her foster family. Case manager Edgeworth testified that all four children were doing very well in their foster placement and had experienced a lot of growth and healing in that environment. CASA McAnear testified that she transported L.J. and L.A.K. back to their foster home after the monitored return to Mother broke down, and the children were very excited to see "mom and dad." She also testified that the foster placement was a very healthy, happy household. By contrast, she observed two or three visits with Father and L.J., and she observed no attachment or emotion. She also testified that L.J. never called Father "dad." On one of those visits, L.J. resisted going to Father and clung tightly to McAnear. But after McAnear pried L.J. off, L.J. "did okay."

Edgeworth testified that Father did not participate in this case from its inception in December 2021 until late summer 2023, which supports an inference that he did not see L.J. for about a year and a half. Father testified that he visited L.J. twice in 2023 and roughly five to seven times in 2024. He also testified that he and L.J. enjoyed their visits together and that she called him "daddy" or his nickname "Peanut." CASA McAnear, however, testified that she observed two or three visits and did not hear L.J. call Father "dad."

Under the heading of L.J.'s needs, we note also evidence that she was "affectionately bonded" to her three half-siblings also involved in this case. A report prepared after L.J. received a psychological evaluation recited that L.J. was "age-appropriately emotionally attached to her siblings and her foster parents." That report concluded that "the optimal placement would be for [L.J.] to be adopted by her foster parents so she can continue to be with her siblings." Thus, the trial judge could reasonably infer that L.J.'s emotional needs would be best served by terminating her relationship with Father and promoting her close relationships with her half-siblings and her foster parents.

Based on the totality of the evidence, the trial judge could reasonably conclude that these factors weighed in favor of termination.

### b. Father's Parental Abilities and Programs to Assist Him

Regarding Father's parental abilities, the record contains little evidence about how he interacted directly with L.J., his other children, or Mother's other children. However, circumstantial evidence supports a finding that termination is in the child's best interest.

Father testified that he saw L.J. twice in 2023 and roughly five to seven times during the first half of 2024. Case manager Edgeworth testified that, according to what she had read (presumably in the Department's case file), Father did not consistently visit L.J. Edgeworth personally witnessed only one visit between Father and L.J., and she said that Father was thirty minutes late to the visit. She further said

–13–

that L.J. acted normally towards Father during the visit. CASA McAnear testified that she witnessed two or three of Father's visits, and she described the visits as uneventful and lacking affection or emotion. She also testified that at the end of a visit in December 2023, Father became very confrontational and yelled very loudly at a caseworker, apparently because he objected to taking "BIP classes," which we take to mean a battering intervention and protection program. *See Dessens v. Argeroplos*, 658 S.W.3d 438, 447, 450 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (discussing such programs under the acronym BIPP). The yelling was loud enough that McAnear and L.J. could hear it in the lobby of the visitation area.

Other evidence also supports a conclusion that Father's parental abilities are subpar. Most important is the evidence that Father both (i) committed acts of domestic violence himself and (ii) continued his relationship with Mother despite her violence against him and despite court orders forbidding contact between them. Even before Father got involved with Mother, he was arrested and placed on community supervision for assaulting a prior partner. He admitted that he and Mother fought in front of the children, albeit before L.J. was born. Father also testified that on one occasion he was holding one of the children while Mother was trying to assault him. On another occasion, apparently in or around August 2023, Mother hit Father with a car. Father also admitted that he bonded Mother out of jail after one of her arrests, and that he was living with Mother as recently as seven months before Father testified at trial. Finally, just a few days before Father testified

–14–

at trial, Mother went to his apartment in the middle of the night and banged on the door until he opened it. Mother was drunk. She entered his apartment and threatened him with a knife while he called the police, and then she ran away. Despite Mother's behavior, Father testified that he had no concerns about Mother's ability to parent.

On the other hand, Father testified that he has learned that he needs to stay away from Mother and that he does not consider his relationship with Mother beneficial. He also points out that Mother signed an MSA agreeing to terminate her parent–child relationship with L.J.

We conclude that the trial judge could reasonably discount the evidence that Father would not resume his relationship with Mother in the face of Father's long history of involvement with Mother despite domestic violence and court orders requiring them to stay apart. The trial judge could reasonably conclude that Father's history of relationships involving domestic violence, his long, violent relationship with Mother contrary to protective orders, and his professed lack of concern about Mother's ability to parent reflected poorly on Father's parental abilities.

Additionally, Father testified that he took L.T.K. to daycare on the day that the daycare noted L.T.K.'s injuries from Mother's hitting her with a belt. The trial judge could reasonably infer that Father knew or should have known about the injuries that the daycare noticed, that Father should have acted on that information, and that Father's failure to do so indicated a lack of awareness or interest in protecting a child.

Moreover, Father testified that he had a total of four children and that he paid child support with respect to only one of them. He claimed that he still provided whatever they needed.

The evidence regarding Father's willingness to avail himself of programs to improve his parental abilities is mixed. When the family was investigated in 2020, Father did not agree to participate in any services. After the instant case began in December 2021, Father did not participate in the case and did not participate in any services until the end of the summer of 2023. On the other hand, Father testified that he did individual counseling, underwent a psychological evaluation, and took a parenting class. He also testified that he took a "BIP course" in 2020. CASA McAnear, however, testified that in December 2023 she witnessed Father become angry with a caseworker about having to take "BIP classes." This suggests that Father was resistant to engaging in services, even if recommended or required, if he believed they were redundant or unnecessary.

Based on the totality of the evidence, the trial judge could reasonably conclude that these factors weighed in favor of termination.

### c. The Plans for L.J. and the Stability of the Proposed Placement

Father testified about his plans if he were to obtain custody of L.J. He worked at UT Southwestern Hospital from 6 a.m. to 2:30 p.m., and he planned to put L.J. in daycare while he was at work. He was current on his rent and believed that his current residence was stable. His mother also worked at UT Southwestern Hospital

and provided transportation for him during the week. L.J.'s daycare would be very near Father's residence, and medical facilities were also nearby if she ever needed medical attention. He described what a day in L.J.'s life would be like in conventional terms: he would fix her breakfast, take her to school, take her to parks, help her learn basics like the alphabet, and generally not let her watch television.

Case manager Edgeworth testified that the Department's current plan was for all four children to stay in their current foster placement. She said that the children were doing very well and had experienced growth and healing in that environment. Additionally, CASA McAnear testified that the plan was for the children to stay in their "potential adoptive home." She described the home as "a very healthy, happy household" with boundaries.

It was the trial judge's prerogative to weigh the witnesses' credibility, and she was entitled to discount Father's testimony based on his past conduct and his demeanor at trial. The trial judge could reasonably conclude that these factors weighed in favor of termination.

### d. Father's Acts and Omissions Indicating that the Existing Parent–Child Relationship Is Not a Proper One and Any Excuses for Same

As discussed above, the record contains evidence that Father chose not to participate in this case from its inception in December 2021 until late summer 2023. He saw L.J. twice in 2023 and roughly five to seven times from January to June 2024. There was evidence that L.J. resisted going to Father at one of their visits, and

–17–

that their visits tended to lack attachment or emotion. The trial judge was entitled to credit this evidence as showing that Father and L.J. did not have a proper parent–child relationship. We see no evidence that would provide an excuse for Father's conduct.

The trial judge could reasonably conclude that these factors supported the best-interest finding.

### e. History of Abusive or Assaultive Conduct by the Child's Family; Danger to the Child

We have already discussed the evidence that both Mother and Father have a history of committing abusive or assaultive conduct. Although we see no evidence that L.J. herself was ever abused or assaulted, there is evidence that Mother abused L.J.'s older sister. The trial judge could reasonably conclude that this factor supported the best-interest finding.

Additionally, conduct that exposes a child to uncertainty and instability endangers the child physical and emotional well-being. *In re T.J.*, 2023 WL 1988838, at *9. Although Father testified that he had learned that he needs to stay away from Mother, the trial judge was entitled to discount this testimony based on Father's demeanor at trial and based on Father and Mother's history of getting together even when forbidden by protective order. The judge could reasonably conclude that even the termination of Mother's parent–child relationship with L.J. would not necessarily remove Mother as a dangerous and destabilizing influence in L.J.'s life. Father's unwillingness to participate in this case for a year and a half after

L.J.'s removal also exposed her to uncertainty and instability. The trial judge could reasonably conclude that this factor supported the best-interest finding.

### 4.    Conclusion

After reviewing all the evidence in the light most favorable to the trial judge's best-interest finding and considering any undisputed contrary evidence, we conclude that the trial judge could reasonably form a firm belief or conviction that L.J.'s best interest would be served by terminating Father's parent–child relationship with her. We also conclude that any disputed evidence supporting the finding that a reasonable factfinder could not have credited is not so significant that the trial judge could not have formed a firm belief or conviction that it is true. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial judge's best interest finding.

We overrule Father's first issue on appeal.

**B.    Issue Two: Whether the trial judge abused her discretion by appointing the Department as L.J.'s managing conservator.**

In Father's second issue, he argues that we should reverse the appointment of the Department as L.J.'s managing conservator if we reverse the termination of Father's parent–child relationship with L.J. We are not reversing the termination order, so we overrule Father's second issue on appeal. *See In re D.M.*, No. 05-24-00421-CV, 2024 WL 4315019, at *10 (Tex. App.—Dallas Sept. 27, 2024, no pet. h.) (mem. op.) (holding that affirmance of termination order meant that parent lacked standing to challenge order appointing the child's managing conservator).

–19–

## VI.  DISPOSITION

We affirm the Decree of Termination.

/Dennise Garcia/
DENNISE GARCIA
240822F.P05                                          JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN THE INTEREST OF T.K.,
L.T.K., L.J., AND L.A.K.,
CHILDREN.

No. 05-24-00822-CV

On Appeal from the 304th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. JC-21-01161-
W.
Opinion delivered by Justice Garcia.
Justices Reichek and Goldstein
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 28th day of October 2024.